**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ALEX CHEATHAM,**

       **Plaintiff,**         **CIVIL ACTION NO. 12-11428**

  **vs.**

                      **DISTRICT JUDGE DENISE PAGE HOOD**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

### REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**  This Court recommends that Plaintiff's motion for summary

judgment (docket no. 9) be granted, Defendant's motion for summary judgment (docket no.12) be

denied, and this matter be remanded to the Commissioner for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

**II.**    **PROCEDURAL HISTORY:**

      Plaintiff filed an application for a period of disability and disability insurance benefits on

July 21, 2009, alleging disability beginning December 17, 2008.  (TR 13).  The Social Security

Administration denied benefits and Plaintiff filed a request for a *de novo* hearing.  On March 8, 2011

Plaintiff appeared with counsel in Oak Park, Michigan and testified at a video hearing held by

Administrative Law Judge (ALJ) Mary Ann Poulose, who presided over the hearing from Chicago,

Illinois.  (TR 37-59).  Vocational Expert (VE) Edward F. Pagella also testified at the hearing via

telephone.  In a July 26, 2011 decision the ALJ found that Plaintiff was not entitled to disability

benefits because he remained capable of performing a significant number of jobs in the national

1

economy.  The Appeals Council declined to review the ALJ's decision and Plaintiff filed a timely complaint for judicial review.  The parties filed cross motions for summary judgment which are currently before the Court.

## III.    PLAINTIFF'S TESTIMONY AND MEDICAL EVIDENCE

### A.    Plaintiff's Testimony

Plaintiff was thirty-one years old on his alleged disability onset date.  (TR 19).  He completed high school and two years of college.  He also attended a technical school where he was certified as a heating and cooling technician.  (TR 42, 122).  He has past work in property maintenance, as a heating and cooling technician, as a production worker for a seating company, as an aircraft cleaner, and as a lifeguard.  (TR 43-45).  Plaintiff testified that he lives at home with his wife and two minor children.  He has a driver's license but claims that back problems keep him from driving long distances.  (TR 45-46).

Plaintiff testified that he has constant stabbing pain in his back and left lower extremity that rated a level seven on a ten point pain scale.  He reported that his pain was worse before surgery.  (TR 53-54).  Plaintiff testified that he is able to take out the trash, occasionally put clothes in the clothes dryer, warm food in the oven, and pay bills with his wife.  (TR 46-47).  He claims that he is able to lift a gallon of milk, walk two to three aisles in the grocery store before sitting, and sit ten to fifteen minutes at a time before needing to stand.  Plaintiff claims that he has no difficulty holding objects, turning doorknobs, or reaching to shoulder level with either arm, although he does have occasional problems using the stairs in his home.  (TR 47-48, 50-51).  Plaintiff reported that he spends his days sitting in a recliner watching television or using a computer.  (TR 48).  He reported that he takes daily naps lasting from two to five hours.  (TR 55).  He testified that he has no

2

difficulty understanding what he watches on television or what he reads in books or magazines. Plaintiff testified that he takes Oxycontin and he uses a Lidocaine patch to control his pain.

**B.    Medical Evidence**

Plaintiff was admitted to Beaumont Hospital from December 22, 2008 through December 23, 2008, during which time he was examined by Dr. Prakash Soares.  Plaintiff presented with complaints of a six to seven week history of low back pain with pain radiating to the left buttock and left thigh.  (TR 173, 226-33).  During this period Plaintiff had an MRI that revealed a large disc herniation at the L5-S1 level.  (TR 246).  Dr. Elskens, a neurosurgeon, examined Plaintiff in the hospital and recommended epidural injections.  (TR 174).

Plaintiff treated with Dr. Elskens on four occasions between December 30, 2008 and May 16, 2009.  (TR 185-93).  On initial examination Plaintiff reported that he received no benefit from epidural steroid injections or physical therapy and he wished to be considered for surgical intervention.  (TR 185, 191).  Dr. Elskens noted that Plaintiff demonstrated moderately restricted movement with pain in all directions, normal stability, strength, and tone, and no tenderness of the spine, ribs, or sacroiliac joints.  He had an antalgic gait favoring the left, and a positive straight leg raising on the left at thirty degrees with associated positive crossed straight leg raising.  Dr. Elskens noted that Plaintiff had a herniated disc at L5-S1 that was worsening.  The doctor performed an L5-S1 laminotomy and discectomy on Plaintiff on January 9, 2009.  (TR 191).

On postoperative examination, Dr. Elskens documented that Plaintiff had full, painless range of motion of the thoracic and lumbar spine, normal stability, strength, and tone, an intact gait and a normal posture.  (TR 213).  He also noted that Plaintiff continued to have midline low back pain that radiated into the left side, but with improvement in radiation.  Plaintiff was given a referral for

3

physical therapy and was instructed that he could return to work in a few weeks.  (TR 213, 292).

At four months postoperatively Plaintiff continued to have low back pain but with resolved pain

radiation.  (TR 215).  His movement was moderately restricted in all directions with pain elicited

in all directions.  An MRI of the lumbar spine dated May 15, 2009 showed no convincing evidence

of recurrence of disc herniation, a normal central spinal canal, and patent neural foramina.  (TR

190).  On May 26, 2009 Dr. Elskens reported that Plaintiff denied low back or radicular pain,

although his most recent MRI showed severe degenerative disease and collapse at the L5-S1 level.

(TR 216).  The doctor recommended a posterior lumbar fusion (allograft) and fusion (autograph).

On September 2, 2009 Plaintiff presented to Dr. Soares with complaints of depression and

persistent low back pain radiating to the thoracic spine.  (TR 220-21).  On examination Plaintiff was

observed to have a normal range of motion with no tenderness of the musculoskeletal spine and a

normal range of motion of the neck.

Sonia Dewberry, a single decisionmaker, completed a physical residual functional capacity

assessment on behalf of the state disability determination service on September 14, 2009.  (TR 253-

60).  Ms. Dewberry opined that Plaintiff could occasionally lift or carry twenty pounds, frequently

lift or carry ten pounds, and stand, walk, or sit about six hours in an eight hour workday with

unlimited push/pull activities.  She found that Plaintiff was not limited in his manipulative, visual,

communicative, or environmental activities, and he could perform all postural activities on an

occasional basis.  (TR 255-57).

In November 2009 Dr. Elskens noted that Plaintiff's overall symptoms had improved despite

the fact that he still experienced midline low back pain, however he continued to recommend

surgery.  (TR 284).  The doctor noted that Plaintiff's gait was intact and he used a cane to ambulate.

An MRI of the lumbar spine dated May 28, 2010 revealed degenerative changes involving the lumbar spine and disc herniation at L5-S1, with facet degenerative arthritic changes. (TR 282). On June 22, 2010 Dr. Elskens noted that Plaintiff's MRI scan showed degenerative changes of the disc at L5-S1, although slightly less than the previous study one year prior. (TR 280). A lumbar MRI showed small recurrent disc with mechanical changes in the spine. (TR 279).

Plaintiff continued his treatment with Dr. Soares from April 11, 2010 through June 2, 2011. (TR 302-53). X-rays of the cervical spine dated April 2010 revealed no evidence of significant disc disease or neuroforaminal encroachment other than some loss of normal lordosis in the neutral position. (TR 335). On examination Plaintiff was reported to have a normal range of motion of the musculoskeletal spine with no tenderness. (TR 327). In September 2010 Plaintiff denied symptoms of depression but he did report feeling "a bit low." (TR 307). In April 2011 Dr. Soares noted that Plaintiff was reluctant to have further epidural injections to treat his back pain, he was unwilling to have spinal fusion surgery, and he was resistant to medications or counseling to treat his depression. (TR 349).

Dr. Alexander Aljouni of Michigan Pain Management Consultants, P.C. examined Plaintiff on March 4, 2011. (TR 299-300). Plaintiff presented with complaints of sharp, constant pain at a level six to seven out of ten. He claimed that the pain worsened with movement, particularly with twisting and bending. Dr. Aljouni observed that Plaintiff walked with a limp, he had full strength in the bilateral lower extremities, he had a diminished range of motion of the lumbar spine particularly with extension, and he had areas of significant tenderness of the bilateral lumbar paravertebral musculature. The doctor's impression was left lumbar facet arthropathy and lumbar radiculopathy with recent lumbar discectomy. He recommended that Plaintiff receive an L4-L5

facet block with IV sedation, along with a bilateral lumbar paraventricular muscle trigger point injection.

Dr. Soares completed a Physical Medical Source Statement of Ability to do Work-Related Activities on June 2, 2011.  (TR 354-59).  In the statement Dr. Soares checked boxes indicating that Plaintiff could never lift or carry any amount of weight, he could sit three hours at a time and stand or walk one hour at a time for a total of one hour in an eight hour workday, he could ambulate fifty feet without the use of a cane, and it was medically necessary that he use a cane to ambulate.  Dr. Soares opined that Plaintiff could occasionally reach, push, or pull, and frequently handle, finger, and feel with the right hand only.  He could occasionally operate bilateral foot controls.  The doctor documented that Plaintiff could occasionally balance and climb ramps and stairs, and never stoop, kneel, crouch, crawl, and climb ladders or scaffolds.  The doctor reported that Plaintiff was unable to walk a block at a reasonable pace over rough or uneven surfaces, he could not use public transportation or shop, and he could not climb a few steps at a reasonable pace with the use of a single hand rail.

On September 24, 2009 psychiatrist Dr. R. Hasan performed a psychiatric examination of Plaintiff for the state disability determination service.  (TR 261-64).  Plaintiff reported that he was depressed as a result of his pain and limited physical capabilities.  He reported having difficulty with sleeping and concentration, and he claimed to get easily frustrated and suffer from mood swings. Dr. Hasan reported that Plaintiff was alert and oriented times three, he could recall four out of four numbers forward and backwards, and he could recall two of three objects after a three minute delay. The doctor diagnosed Plaintiff with adjustment disorder with depressed mood, and mood disorder due to chronic pain.  He was assigned a GAF of 55.  Dr. Hasan noted that Plaintiff should be able

to understand, retain, and follow simple directions, although he would be restricted to performing routine, repetitive, concrete, and tangible tasks.  The doctor further opined that Plaintiff should be restricted to work that involves brief and superficial interactions with supervisors, co-workers, and the general public.  (TR 264).

Dr. Daniel Blake, Ph.D., completed a psychiatric review technique on October 25, 2009. (TR 265-78).  Dr. Blake found that Plaintiff had only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, and no episodes of decompensation.  Dr. Blake concluded that Plaintiff's case was nonsevere, and his depressive symptomatology was not so severe as to interfere in his functional abilities.  (TR 277).

## IV.    VOCATIONAL EXPERT TESTIMONY

The VE verified that Plaintiff's past work as a general laborer and service technician was heavy, unskilled labor; past work as a heating and cooling technician was medium, skilled labor; past work as a lifeguard was medium, semi-skilled labor; past work as a production worker was medium, unskilled labor; and past work as a salesman was light, semi-skilled labor.  (TR 57).  The ALJ asked the VE to testify whether jobs were available for an individual with Plaintiff's age, education, and past work experience who was able to perform light work that required only occasional climbing, crouching, crawling, stooping, and kneeling.  (TR 57).  The VE testified that the individual would be able to perform Plaintiff's past work as a salesman, as well as work as a hand assembler, hand packer, and hand sorter, comprising 1,132,000 jobs in the national economy. Next, the ALJ asked whether jobs were available for an individual who required sedentary work with a sit/stand option. The VE testified that the individual could perform sedentary work as a hand sorter, bench assembler, and bench packager, comprising 417,000 jobs in the national economy.  The

VE further testified that the individual could not maintain employment if he was off task more than fifteen percent of the workday.

## V.       ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff has not engaged in substantial gainful activity since his alleged onset date of December 17, 2008, and suffers from the severe impairments of lumbar herniation/degenerative disc disease status-post discectomy, he does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (TR 13-17). The ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform sedentary work with a sit/stand option at will, except with only occasional balancing, climbing, kneeling, stooping, crouching, and crawling. (TR 17-19). The ALJ concluded that while Plaintiff was not able to perform his past relevant work, he remained capable of performing a significant number of jobs in the national economy, and therefore he was not under a disability as defined in the Social Security Act from December 17, 2008 through July 26, 2011, the date of the ALJ's decision. (TR 15-18).

## VI.      LAW AND ANALYSIS

## A.       Standard Of Review

Pursuant to 42 U.S.C. § 405(g), the district court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

8

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

**B.    Framework for Social Security Disability Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1. he was not engaged in substantial gainful employment; and
2. he suffered from a severe impairment; and
3. the impairment met or was medically equal to a "listed impairment;" or
4. he did not have the residual functional capacity to perform his past relevant work.

20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented him from doing his past relevant work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. 20 C.F.R. § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question

9

if the question accurately portrays the plaintiff's physical and mental impairments. *Id.* (citations omitted).

## C.    Analysis

Plaintiff argues that the ALJ failed to consider all of the medical evidence in forming Plaintiff's RFC finding, failed to properly evaluate a treating source opinion, failed to properly evaluate Plaintiff's mental impairment, and impermissibly relied upon telephone testimony.

### 1.    *Evaluation of the Medical Evidence*

First, Plaintiff argues that the ALJ selectively reviewed the medical evidence before concluding that Plaintiff's post-surgical treatment was generally successful in controlling his symptoms. Specifically, Plaintiff challenges the ALJ's reliance on evidence showing that several months after surgery Plaintiff reported that his pain radiation had resolved and his symptoms had improved. According to Plaintiff, the ALJ wrongly interpreted this evidence to mean that Plaintiff's treatment had been generally successful in controlling his disabling symptoms. Plaintiff contends that had the ALJ accurately assessed the evidence, she would have found that Plaintiff's symptoms worsened following surgery. He argues that the ALJ improperly assessed the evidence, gave him a clean bill of health, and insinuated that he had only minor problems.

There is no dispute that an ALJ is required to evaluate the claimant's entire record when formulating the plaintiff's RFC. *Webb v. Comm'r*, 368 F.3d 629, 633 (6th Cir. 2004) (citing 20 C.F.R. § 416.920(a)(4)(iv)). However, there is no mandate that the ALJ discuss all of the evidence of record. In fact, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r*, 167 Fed. Appx. 496,

507-08 (6th Cir. 2006) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).

In the instant case the ALJ reviewed the evidence and concluded that Plaintiff suffered from the severe impairment of lumbar herniation/degenerative disc disease status-post discectomy. The ALJ then considered the medical evidence of record in formulating the RFC. Specifically, the record shows that the ALJ considered and cited to the admission note and outpatient records from Beaumont Hospital (Exhibits 1F, 3F), the treatment notes of Dr. Elskens and Dr. Soares (Exhibits 2F, 4F, 10F, 13F), the medical source statement of Dr. Soares (Exhibit 14F), and the records supplied by the Michigan Pain Management Consultants (Exhibit 11F). (TR 16-19).

In her assessment, the ALJ referred to evidence which she found to both support and oppose Plaintiff's claim of disability. The ALJ noted that Plaintiff consistently complained of low back pain and pain radiating to his left lower extremity. She noted that Plaintiff had a large herniation at L5-S1, effacing subarachnoid space, and compressing thecal sac and L4 abutment. She recognized that Plaintiff underwent surgery and over time showed post-surgical degenerative changes of his spine. She also noted that Plaintiff continued to exhibit decreased range of motion and tenderness of the lumbar spine postoperatively. Along with the above, the ALJ considered Plaintiff's own testimony that he was unable to lift a 24-can case of soda and he had problems sitting, standing, and walking due to pain. Balanced against this, the ALJ reviewed evidence which tended to show that Plaintiff was not disabled. Such evidence included medical reports showing that Plaintiff had normal range of motion, no tenderness, intact sensation and gait, full strength in his extremities, and no sensory or neurological deficits.

Plaintiff's argument that the ALJ improperly assessed the medical evidence with regard to his physical ability is not persuasive.  The record shows that the ALJ reviewed the evidence and noted that there were post-surgical examinations at which Plaintiff reported that his symptoms had improved and his radiating pain had resolved.  Nonetheless, the ALJ found that Plaintiff's medical condition of lumbar herniation/degenerative disc disease status-post discectomy was a severe impairment that more than minimally impacted his ability to lift, carry, sit, stand, balance, climb, stoop, kneel, crouch, and crawl.  In addition, far from giving Plaintiff a clean bill of health, the ALJ restricted Plaintiff, who was only thirty-one years old on his alleged disability onset date, to a limited range of sedentary work provided he be permitted to sit/stand at will and avoid anything more than occasional balancing, climbing, kneeling, stooping, crouching, and crawling.  The record shows that the ALJ reasonably assessed the evidence of Plaintiff's physical condition in making her assessment. However, as discussed below, the ALJ did not properly assess evidence pertaining to Plaintiff's mental impairment.

2. *Treating Physician Rule*

Plaintiff next argues that the ALJ erred in attributing little weight to the June 2, 2011 Physical Medical Source Statement of Ability to do Work-Related Activities completed by treating physician Dr. Soares.  It is widely recognized that the Commissioner has imposed "certain standards on the treatment of medical source evidence."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1502).  Under the treating source rule, the ALJ must "give a treating source's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Id*. (citation and internal quotation marks omitted).  The Commissioner requires its ALJs

12

to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." *Id.* (citation omitted). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Id*. (citation omitted). The Sixth Circuit has "made clear" that it will remand the Commissioner's determination if it has not provided good reasons for the weight it has given to a treating physician's opinion. *Id*. at 939 (citing *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)).

If the ALJ fails to follow an agency rule or regulation, then the ALJ's failure "denotes a lack of substantial evidence, even where the [ALJ's conclusion] may be justified based upon the record." *Id*. at 939-40 (citation omitted). But a failure to follow the treating source rule can be deemed "harmless" if the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it[.]" *Id*. at 940 (citation omitted). "An opinion may be patently deficient if the treating source offers no explanation to support it." *Fleming v. Comm'r*, No. 10-25, 2011 WL 3049146 at *9 (E.D. Tenn. July 5, 2011) (citing *May v. Astrue*, No. 09-00090, 2009 WL 4716033 at *8 (S.D. Ohio Dec. 9, 2009) (finding treating source opinion patently deficient where treating source simply checked boxes about the plaintiff's alleged disability and failed to provide supporting explanations or objective evidence)).

Here, the ALJ discussed the June 2, 2011 opinion of Dr. Soares and assigned it little weight after concluding that the opinion was not supported by the objective evidence of record. In his opinion, Dr. Soares checked boxes indicating that Plaintiff had significant limitations which included that he had the ability to walk only fifty feet, he required the use of a cane, he could only

occasionally reach and push/pull with his right arm, operate foot controls, tolerate exposure to extreme heat and cold, and never tolerate exposure to unprotected heights, moving mechanical parts, and vibrations.  The ALJ found that the medical source statement was not consistent with treatment notes that showed that Plaintiff had a normal range of motion, intact sensation and gait, and no tenderness, focal, motor, or sensory deficits.  The ALJ further concluded that the opinion was not supported by Plaintiff's own testimony stating that he had no difficulty reaching with his arms.  Additionally, the ALJ found that the medical source statement lacked record support because there was no evidence in the record to show that Plaintiff had environmental limitations.

Dr. Soares did no more than simply check boxes indicating Plaintiff's various limitations.  Of particular importance, Dr. Soares left blank those portions of the medical source statement which asked him to identify the medical or clinical findings that supported his assessments.  The ALJ noted evidence in the record that conflicted with Dr. Soares' opinion.  The undersigned concludes that the ALJ properly assessed the June 2, 2011 medical source statement of Dr. Soares and provided the requisite "good reasons" for assigning the opinion little weight.

3.     *Evaluation of Plaintiff's Mental Impairment*

Next, Plaintiff argues that the ALJ improperly evaluated Plaintiff's mental impairment at steps two and three of the sequential analysis.  The Commissioner has prescribed rules for evaluating the severity of mental impairments.  *See* 20 C.F.R. § 404.1520a.  The Commissioner first determines whether there is a medically determinable mental impairment specified in one of nine diagnostic categories.  *See id.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A.  Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

14

The "B" criteria require an evaluation in four functional areas with a relative rating for each area.  20 C.F.R. § 404.1520a(c)(3).  The Commissioner must evaluate limitations in activities of daily living, social functioning, and concentration, persistence, or pace and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme.  The fourth area is deterioration or decompensation in work or work-like settings and calls for a rating of never, one or two, three, and four or more.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  20 C.F.R. § 404.1520a(c)(4).

The Commissioner determines the severity of the mental impairment only after rating the degree of functional limitations resulting from impairment.  20 C.F.R. § 404.1520a(d).  "At the administrative law judge hearing ... [the administrative law judge] will document application of the technique in the decision" and must incorporate her findings and conclusions in the written decision, making a specific finding as to the degree of limitation in each of the four functional areas.  20 C.F.R. § 404.1520a(e)(4).

Failure to follow the mental impairment regulations of 20 C.F.R. § 404.1520a may constitute harmless error in certain limited circumstances.  *Rabbers v. Comm'r*, 582 F.3d 647, 657-58 (6th Cir. 2009).  In *Rabbers*, the ALJ failed to make specific B criteria findings when evaluating the severity of the claimant's mental impairment as required under 20 C.F.R. § 404.1520a(e).  The Sixth Circuit concluded that the error was harmless for two reasons, first because the ALJ ultimately concluded that the claimant's mental impairment was severe, and second because the error did not prejudice the claimant since the administrative record clearly indicated that the mental impairment was not sufficiently severe to meet the criteria of any listed impairment.  The court opined that "courts

generally should exercise caution in conducting harmless error review" in those cases where the record contains conflicting or inconclusive evidence relating to the B criteria. *Id*.

Unlike *Rabbers*, here the ALJ did not determine that Plaintiff's mental impairment was severe. (TR 16). Instead, the ALJ found that Plaintiff's symptoms of adjustment disorder were not severe, basing her decision on medical evidence showing that Plaintiff's symptoms were characterized as mild and Plaintiff refused medication and counseling.

Defendant argues that even if the ALJ had made specific findings regarding the paragraph B criteria, it would not have changed the ultimate disposition of the case. The undersigned is unable to state with absolute certainty that the ALJ would reach the same outcome had she conducted the proper analysis of Plaintiff's mental impairment. While admittedly the evidence that Plaintiff's mental impairment is severe is not overwhelming, there is conflicting evidence in the record as to three of the four functional areas. For instance, there is evidence that Plaintiff's activities of daily living were only mildly impaired, but also evidence to show that his activities of daily living were fairly restricted. There is evidence to show that he was only mildly impaired in social functioning, yet evidence that he was socially isolated and had difficulty getting along with others. (TR 262, 264). There is conflicting evidence showing that Plaintiff had no difficulties focusing on a book or television show, yet evidence to show that he had impairments in his ability to focus and concentrate. (TR 262). While the ALJ noted that Plaintiff refused medications and counseling to treat his depression, the record is not clear that anti-depressive medication and counseling were prescribed. Nor is there any discussion as to whether Plaintiff had a good reason for refusing to pursue certain treatment options. *See* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled....").

16

To compound matters further, the ALJ's designation of Plaintiff's mental condition as nonsevere appears to have led to its exclusion in the remainder of the ALJ's decision. In other words, there is no further discussion of Plaintiff's depressive symptoms or adjustment disorder throughout the remainder of the ALJ's opinion. Thus, it is not clear that the ALJ considered the entire medical record, and in particular evidence pertaining to Plaintiff's mental condition, in formulating the RFC.

The undersigned recommends that this matter be remanded pursuant to sentence four of 42 U.S.C. § 405(g) to permit the ALJ an opportunity to articulate the special findings attributed to Plaintiff's mental impairment and consider whether and how Plaintiff's mental condition may impact the RFC finding.

4.    *Telephonic Vocational Expert Testimony*

Plaintiff argues that the ALJ erred in Step Five of her disability determination by relying on the telephonic testimony of the vocational expert. Plaintiff relies upon *Edwards v. Astrue*, No. 10-1017, 2011 WL 3490024 (D. Conn. Aug. 10, 2011) to support his argument. In *Edwards*, the claimant was informed at the administrative hearing that the medical expert's testimony would be made by telephone. The claimant objected on the basis that she had not received notice of telephonic testimony prior to the hearing. She also claimed that it was her right to cross-examine the witness in person. The ALJ noted the objection but did not rule on it and ultimately denied the claimant's application for benefits, twice noting in his ruling that the medical expert testified persuasively.

On review, the *Edwards* court held that the Commissioner committed legal error by failing to provide the claimant with notice prior to the hearing that the medical expert would testify by

17

telephone.  The court reached this conclusion after noting that 20 C.F.R. § 404.938(b) requires that the claimant be notified if her appearance or that of any other party or witness will be made by video teleconferencing rather than in person.  The court interpreted this provision to also require notification to the claimant prior to the hearing if a medical expert would testify at the hearing by telephone.  The court concluded that a medical expert should not be permitted to testify telephonically over a claimant's timely objection.  The court went on to conclude that the error was not harmless, finding it possible that the claimant's "cross-examination may have been more effective" or the ALJ may have found the expert's testimony less persuasive if he had appeared in person or by video teleconference.

Other courts have applied this rule in the context of vocational expert testimony.  In *Koutrakos v. Astrue*, No. 11-306, 2012 WL 1283427 (D. Conn. Jan. 9, 2012), the court observed that the Social Security Administration's (SSA's) regulations governing the manner in which testimony may be taken permit testimony by video teleconference but do not similarly provide for telephonic testimony.  The court concluded that the ALJ committed a legal error that could not be considered harmless when it allowed the telephone testimony over the claimant's objection and remanded the matter for further proceedings. *Koutrakos v. Astrue*, No. 11-306, 2012 WL 1247263 (D. Conn. April 13, 2012).  In *Green v. Astrue*, No. 11-11711, 2013 WL 636962 (D. Mass Feb. 20, 2013), the court held that the Commissioner's failure to provide the claimant with notice that the vocational expert would testify by telephone constituted a violation of the SSA regulations.  However, the court went on to hold that the violation was harmless because the plaintiff had ample opportunity during the hearing to question the expert and had not provided evidence to show that he was prejudiced by the vocational expert's telephone testimony.  In *Palaschak v. Astrue*, No. 08-1172, 2009 WL 6315324

(N.D. N.Y. Nov. 18, 2009), the court also concluded that it was harmless error to allow the vocational expert to testify via telephone because the claimant extensively cross examined the vocational expert and obtained key concessions during the examination.  Although the court concluded that the use of phoned-in VE testimony was harmless, it was troubled by its use of telephone testimony over the objection of the claimant and recommended that the Commissioner revisit its procedure with respect to telephone testimony.

20 C.F.R. § 404.938 provides that the Commissioner will provide the claimant with notice of a hearing before an administrative law judge.  Among other things, the notice must inform the claimant if a witness's appearance will be made by video teleconferencing rather than in person.  As noted by other courts, SSA regulations do not overtly authorize the use of telephone testimony.  While this circuit has not ruled on the use of telephone testimony at the administrative hearing, 20 C.F.R. § 404.938 at least suggests that the claimant should be given advance notice if a witness will not appear in person at the administrative hearing.  In the instant case, the Notice of Hearing sent to Plaintiff indicated only that the hearing would proceed via video teleconference.  (TR 72).  Furthermore, at no time prior to or during the administrative hearing was the claimant given any explanation as to why the VE was testifying via telephone.

This case is unlike *Edwards*, *Koutrakos*, *Green* and *Palaschak* in which the claimants objected to the VE's phoned-in testimony.  Here, Plaintiff's counsel did not object to the telephone testimony and chose not to ask any questions of the VE at the administrative hearing.  In addition, Plaintiff has not argued that he was prejudiced by the telephone testimony or by the lack of notice that the VE's testimony would be taken by telephone.  Therefore, if the Court adopts a harmless error analysis, this matter will not require remand.  However, the undersigned is recommending that

19

this matter be remanded on other grounds.  Therefore, it is the undersigned's recommendation that the Commissioner be made aware that its failure to provide notice of the VE's telephone testimony may have violated 20 C.F.R. § 404.938(b).  *See Marasco v. Astrue*, No. 10-3970, 2012 WL 4717991, at *7 (N.D. Cal. Oct. 2, 2012) ("Because the court must remand on other grounds, it will do no more with this issue than to note that the failure to provide notice for [the expert's] telephonic testimony may have violated Section 404.938(b).").  The Commissioner should be given an opportunity to correct this issue on remand.

## REVIEW OF REPORT AND RECOMMENDATION:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and

20

labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court

determines that any objections are without merit, it may rule without awaiting the response.


Dated: March 19, 2013                s/ Mona K. Majzoub
                                     MONA K. MAJZOUB
                                     UNITED STATES MAGISTRATE JUDGE



## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel

of Record on this date.

Dated: March 19, 2013                s/ Lisa C. Bartlett
                                     Case Manager

21